UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KAYDEN C. BURKE, | Case No. 1:18-CV-00065-CWD |
| Petitioner, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security Administration, | |
| Respondent. | |

## INTRODUCTION

Currently pending before the Court is Kayden Burke's Petition for Review of the

Respondent's denial of social security benefits, filed on February 8, 2018. (Dkt. 1.) The

Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and

the administrative record (AR), and for the reasons that follow, will remand the decision

of the Commissioner.

**MEMORANDUM DECISION AND ORDER - 1**

# PROCEDURAL AND FACTUAL HISTORY

In a determination dated July 7, 2011, Petitioner was found disabled as of June 2, 2011. Petitioner received disability insurance benefits beginning July 7, 2011. On September 22, 2014, it was determined, during an eligibility review, that Petitioner was no longer disabled as of September 1, 2014. His disability benefits ceased in September of 2014. (AR 26, 45.) On October 24, 2014, Petitioner requested reconsideration. The request for reconsideration was denied and a hearing was conducted on May 23, 2016, before Administrative Law Judge (ALJ) Stephen Marchioro. After considering testimony from Petitioner and a vocational expert, ALJ Marchioro issued a decision on June 27, 2016, finding Petitioner's disability under Section 1614(a)(3)(A) of the Social Security Act ended on September 1, 2014, and the Petitioner had not become disabled again since that date. (AR 29.)

Petitioner timely requested review by the Appeals Council on July 28, 2016. (AR 182.) Petitioner submitted additional medical records for consideration by the Appeals Council on January 18, 2017, March 3, 2017, and July 10, 2017, covering the period of July 3, 2015, through June 5, 2017. (Exhibits 36F – 40F, AR 1608 – 1674.)[1] The Appeals Council considered the additional evidence, but found that the evidence did not provide a basis for changing the ALJ's decision. The Appeals Council denied Petitioner's request

---

[1] The majority of the medical records submitted to the Appeals Council after the May 23, 2016 hearing covered the period after the hearing date, with the exception of an office visit with Dr. Waters and imaging reports dated July 3, 2015, and a laboratory report dated July 15, 2015. (Ex. 37F, AR 1625 – 1631.)

for review on December 15, 2017. (AR 1-3.) Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

Petitioner was born on June 1, 1993; he was found to be disabled at age fourteen, after having been diagnosed with systemic lupus erythematosus, chronic sinusitis, osteoporosis, obesity, cardiomyopathy, and bilateral osteonecrosis of the ankles requiring a surgical repair of the right ankle. Imaging of both ankles and his wrists on November 8, 2010, and again on May 23, 2011, revealed bilateral osteonecrosis of the ankles. (AR 80.) At that time, benefits were awarded on the basis that he met Listing 1.02A (Major Dysfunction of a Joint) because he was unable to ambulate effectively. Petitioner was non-weight bearing, and required a wheelchair due to bilateral osteonecrosis.

Petitioner graduated from high school despite medical issues preventing his regular attendance. (AR 45-46.) During his senior year of high school, Petitioner estimated he was absent for ninety percent of the school year. (AR 62, 1534.) He has no past relevant work, and has never obtained employment. (AR 47.) Petitioner began a vocational rehabilitation program, but he testified he was unable to complete the program because of health reasons. (AR 47.)

In 2015, Petitioner began preparing for a two-year mission for his church. (AR 47; 1597.) Prior to leaving Idaho, Petitioner had a physical examination on May 4, 2015. (AR 1503.) His treating physician, Joseph Waters, M.D., summarized Petitioner's medical

history, noting that his lupus was currently controlled with CellCept. (AR 1503.) His past medical history was remarkable for a concurrent hypercoagulable state with deep vein thrombosis in his leg and a venous thrombosis of the jugular vein. Petitioner is chronically anticoagulated with Coumadin. Dr. Waters noted also that, over the past year, but prior to the May 4, 2015 examination, Petitioner developed papilledema and was found to have increased intracranial pressure associated with a venous sinus thrombosis. Petitioner was asymptomatic after undergoing treatment with Diamox. (AR 1503.) Petitioner also had a history of mild hypertrophic cardiomyopathy, but with treatment, he was currently asymptomatic.

Dr. Waters noted also that Petitioner's prior medical history included a diagnosis of avascular necrosis of the talar dome, and after undergoing arthroscopic debridement and a bone graft "several years ago," he was left with chronic right ankle pain. (AR 1503.) Despite the ankle pain, Petitioner could now walk up to a mile continuously without too much of an increase in pain. (AR 1504.) Dr. Waters was of the opinion that, despite Petitioner's multiple chronic medical problems, he was stable enough at that time to perform the duties required for a mission, so long as he did not travel outside of the United States and he had access to medical care. (AR 1505.)

Petitioner sprained his right ankle on July 2, 2015. (AR 1630.) Imaging studies dated July 3, 2015, did not reveal a fracture, and upon examination, Dr. Waters noted that Petitioner's injuries were limited to soft tissue sprain and strain. (AR 1630). Dr. Waters did note, however, that Petitioner's right ankle had limited range of motion, suggesting

development of an auto fusion. (AR 1630.)

In September of 2015, Petitioner embarked on a two-year mission in Kansas City, Missouri. (AR 47; 1597.) As an accommodation, the church allowed him to use a car to perform his missionary duties. (AR 48.) Petitioner testified at the hearing that his schedule was rigorous, requiring 14 to 16 hours a day of missionary work or other activities. (AR 47-48.) Petitioner stated that he would start his day at 6:30 a.m. by getting ready, and began studies at 8:00 a.m. for two hours. (AR 48.) After completing his studies, he would do missionary work, which meant visiting church members' and other people's homes. (AR 48.) He was required to maintain this schedule for five days each week. (AR 48.) On Sundays, he attended church services, and Mondays were preparation days. (AR 48.)

Petitioner testified that, during his mission, his attendance was unreliable, and he had instances when he was not able to function due to his various medical conditions. (AR 53, 60.) At the beginning of his mission, he estimated he was absent once every two weeks because of his chronic sinusitis. (AR 61.) When his sinusitis progressed, he began missing three days or more each week of missionary work. (AR 61.) A review of his medical records establishes multiple visits to health care providers for recurrent infections, detailed below.

Upon arriving in Kansas City, Petitioner established care at the Mosaic Life Care Clinic on September 17, 2015. (AR 1582.) Drs. James Walker and Christopher Trimble provided medical care to him. Because of recurring sinusitis, Petitioner was initially

placed on antibiotics in November of 2015. (AR 1548.) On December 7, 2015, at a follow-up appointment for his sinusitis, it was noted that a prior CT scan showed pansinusitis and it was recommended he have sinus surgery. (AR 1553.) Petitioner presented with a cough, and another round of antibiotics was started. (AR 1553.) Thereafter, Petitioner was diagnosed with pneumonia on December 11, 2015. (AR 1576.) Dr. Walker did not believe hospitalization was necessary, and antibiotics were started again. (AR 1578.)

On December 17, 2015, Petitioner sought follow up care, stating he felt improvement from the pneumonia symptoms, but felt his nasal congestion, cough, and postnasal drainage were worse. (AR 1563.) On December 22, 2015, Petitioner sought follow-up care for pneumonia, in addition to his chronic sinus congestion and infection symptoms. (AR 1557.) Symptoms included a persistent, productive cough. (AR 1561.) Because his pneumonia symptoms appeared to be improving clinically, Petitioner was not hospitalized, and he was treated with prednisone. (AR 1559.)

On January 28, 2016, Petitioner complained about a several day history of increasing sinus congestion, pressure, chest congestion, and cough. (AR 1568.) His treating physician noted problems with recurrent infection, and another round of antibiotics was started. (AR 1570.) On March 10, 2016, his treating physician noted Petitioner's recurring infection was not getting better. (AR 1548.) Another round of antibiotics was started. (AR 1550.) On March 18, 2016, Petitioner started feeling mildly better, but stated to his physician that he was fatigued. (AR 1572.) Dr. Trimble noted that

Petitioner had been on continuous antibiotics for the last six months, and he recommended that Petitioner return home for further treatment, which included a recommendation for surgery to treat his chronic sinusitis. (AR 61, 1574.) Because of continued problems with recurrent sinusitis, Petitioner was sent home to Idaho from Kansas City in late March of 2016. (AR 47.) Petitioner's two-year mission ended after seven months, and he did not resume his mission.

Upon returning to Idaho, Petitioner continued to complain of persistent fatigue. (AR 1592.) At an office visit with his treating pediatric rheumatologist, Dr. Hersh, on April 4, 2016, Petitioner complained that, upon awakening, his arms felt weak. (AR 1593.) The etiology of Petitioner's fatigue was unclear at that time given his lupus was inactive. (AR 1595.) Dr. Hersh noted that Petitioner complained of persistent fatigue, despite returning home and no longer being subjected to a rigorous schedule. (AR 1592-93.)

Petitioner followed up with Dr. Waters for his complaints of persistent fatigue on September 26, 2016. (AR 1622.)[2] Petitioner reported that his fatigue had been present since February of 2016, but had worsened over the past four weeks. Petitioner complained of feeling tired all of the time, and wanting to sleep more, along with experiencing a generalized feeling of weakness. (AR 1622.) Dr. Waters noted that Petitioner's neurologist diagnosed him with idiopathic sleep paralysis, to be treated with

---

[2] The following medical evidence was not before the ALJ, but was reviewed and considered by the Appeals Council.

**MEMORANDUM DECISION AND ORDER - 7**

Lexapro. (AR 1622.) Petitioner reported increased fatigue after starting the Lexapro. Dr.

Waters recommended decreasing the dosage of Lexapro, and ordered lab work to

determine the cause of Petitioner's fatigue, including testing for C. difficile. (AR 1623.)

On September 30, 2016, lab results indicated the test for C. difficile was

inconclusive,[3] and the doctor's note instructed Petitioner to remain on isolation

precautions until a final determination was made. (AR 1612.) Petitioner's final test results

for C. difficile infection came back positive on October 2, 2016. (AR 1613.) Dr. Waters

noted that the infection was likely the cause of Petitioner's persistent loose stools, and

possibly the cause of his fatigue. (AR 1613.) Dr. Waters prescribed a course of

antibiotics.

On December 29, 2016, Dr. Waters noted persistent nasal congestion, ear pain,

and postnasal drip, with symptoms persisting for greater than four weeks despite sinus

surgery several months ago. (AR 1609.)[4] Petitioner also sought follow up care for

symptoms of depression and chronic fatigue. (AR 1607 - 1609.) It was noted that

---

[3] Clostridium difficile is a bacterial infection that is a frequent cause of colitis and diarrhea following antibiotic use. It is found to be a cause of pseudomembranous colitis and is associated with a number of intestinal diseases that are linked to antibiotic therapy. 182620 Clostridium difficile, STEDMANS MEDICAL DICTIONARY 182620.

[4] The medical records from Petitioner's sinus surgery are not in the Administrative Record. Later notes from rheumatologist Patrick Knibbe, M.D., from January 17, 2017, indicate that a review of Petitioner's medical records documented sinus surgery occurred at the University of Utah Children's Medical Center in June of 2016. (AR 1659.) A medical progress note by Dr. Waters dated December 29, 2016, states that Petitioner was "status post sinus surgery several months ago…." (AR 1609.) Petitioner testified at the May 23, 2016 hearing before the ALJ that he had not yet had sinus surgery. (AR 51.)

Petitioner expressed increased suicidal ideation, which Dr. Waters believed could be a side effect of the particular antidepressant medication prescribed. (AR 1610.) Accordingly, Dr. Waters tapered the antidepressant medication, with plans to begin a different antidepressant. (AR 1610.)

Dr. Hersh provided a physician source statement to the Commissioner on January 4, 2017, indicating that Petitioner had been a patient of hers since 2010. She explained that Petitioner's lupus has caused life threatening complications, which included a pulmonary alveolar hemorrhage and widespread blood clotting, as well as clots in his brain. (AR 1632.) Dr. Hersh stated that Petitioner "has recently developed profound fatigue and weakness which impairs his ability to do even simple tasks. He has had an extensive workup as to the cause of this and the evaluation is on going. Unfortunately at this point it is interfering with his ability to attend work, go to school or to participate in an LDS church mission all of which he has a strong desire, but is unable, to do." (AR 1632.)

It appears from the record that Petitioner transitioned his care from Dr. Hersh to rheumatologist Patrick Knibbe, M.D., on January 17, 2017. (AR 1659.) On that date, Petitioner complained of periodic weakness which was worse in the mornings. Dr. Knibbe opined that Petitioner suffered from more of a periodic fatigue rather than from a muscle weakness. (AR 1659.) He noted also Petitioner appeared to have a flat affect, and a trial of Cymbalta was started for Petitioner's mood disorder. (AR 1661.)

At an office visit on February 28, 2017, with Dr. Knibbe, Petitioner's chief

complaint was frequent nose bleeds at night. (AR 1655.) Dr. Knibbe noted Petitioner was undergoing physical therapy to assist with muscle strength. (AR 1656.)

Later in 2017, Petitioner contracted cellulitis[5] in his left leg, which came on rapidly and required hospitalization from May 20 to 26, 2017. (AR 1645, 1635.) His hospitalization was notable for respiratory symptoms, including chest pressure along with dyspnea. (AR 1635.) It was considered to be a lupus flare. It was noted also that Petitioner had mild anemia and mild elevation of his LFTs.[6] (AR 1635.) During a follow-up appointment with Dr. Waters on June 1, 2017, he noted Petitioner appeared much better after being discharged from the hospital. (AR 1637.) Dr. Waters ordered repeat lab work to follow up on the abnormal lab work during Petitioner's hospital stay. (AR 1637.)

On June 5, 2017, Petitioner reported skin irritation in his left calf at the site of the cellulitis infection. (AR 1650.) Petitioner reported also an increase in "fatigue and sun exposure with systemic symptoms related to [the] same." (AR 1650-61.) Lab tests ordered that date included a CBC, comprehensive metabolic panel, and quantitative immunoglobulins, which results were all abnormal. (AR 1653.) No further medical evidence exists in the record after this date.

---

[5] Cellulitis is an "infection of soft tissue with organisms that produce extensive tissue necrosis and local vascular occlusions; streptococci, clostridia, and anaerobes are known causes, but most cases recently have been polymicrobial." 159980 gangrenous cellulitis, STEDMANS MEDICAL DICTIONARY 159980 (Syn: necrotizing cellulitis.)

[6] LFT stands for Liver Function Test.

## SEQUENTIAL PROCESS

Once a claimant has been found to be entitled to disability benefits, the Social Security Administration conducts periodic reviews to evaluate a claimant's continued eligibility to receive benefits. If upon review the Commissioner finds that a claimant is no longer disabled, his benefits may be terminated. However, disability benefits may be terminated only if substantial evidence demonstrates (1) "there has been any medical improvement in the claimant's impairment," and (2) the claimant "is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f)(1). Such determination is made "on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f)(4).

To determine whether there has been medical improvement, an ALJ must compare the current medical severity of the claimant's impairment to the medical severity of the impairment "at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(7). Medical improvement is defined as "any decrease in the medical severity" of the claimant's impairment and requires "comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. §§ 404.1594(b)(2), 404.1594(c)(1).

The ALJ determined that the most recent favorable medical decision finding Petitioner disabled was the determination dated July 7, 2011, known as the comparison point decision. (AR 22.) At the time of the comparison point decision, the ALJ noted Petitioner's systemic lupus erythematosus, chronic sinusitis, osteoporosis, obesity, cardiomyopathy, and bilateral osteonecrosis of the ankles with surgical repair of the right ankle were severe, and that Petitioner's impairments met Listing 1.02A. (AR 22-23.) The ALJ determined also that the medical evidence established Petitioner did not develop any additional impairments after the comparison point decision through September 1, 2014. (AR 23.)

To determine whether a claimant's disability continues or ends, the Social Security Administration follows a seven-step process under Title XVI. 20 C.F.R. §§ 404.1594(f), 416.994(b)(5). At step one, the ALJ must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. 416.920(d), 416.925, and 416.926. If the claimant meets these criteria, his disability continues. The ALJ determined that Petitioner "has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 C.F.R. part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.925 and 416.926" after September 1, 2014. (AR 23.)

At step two, the ALJ must determine whether medical improvement has occurred by comparing the current medical severity of a claimant's impairment with the severity at

the time of the most recent favorable medical determination of disability. Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs or laboratory findings. 20 CFR 404.1594(b)(1) and 416.994(b)(1)(i). If medical improvement has occurred, the analysis proceeds to step three. If not, the analysis proceeds to step four. The ALJ determined that medical improvement had occurred as of September 1, 2014. The ALJ found that the medical evidence supported a finding that, as of September 1, 2014, there had been a decrease in the medical severity of the impairments. (AR 24.) He noted that Petitioner no longer required the use of a wheelchair or other assistive devices to ambulate. (AR 24.)

At step three, the ALJ must determine whether the medical improvement is related to the ability to work. Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. If it is related, the analysis proceeds to step five. The ALJ determined that Petitioner's medical improvement was related to the ability to work "because, as of September 1, 2014, the claimant no longer had an impairment or combination of impairments that met or medically equaled the same listing that was met at the time of the [comparison point decision] (20 C.F.R. 416.994(b)(2)(iv)(A))." (AR 24.)

At step four, the ALJ must determine if an exception to medical improvement applies. 20 C.F.R. § 416.994(b)(5)(iv). If medical improvement related to the claimant's ability to work has occurred, or an exception to medical improvement listed in 20 C.F.R. § 416.994(b)(3) applies, the analysis proceeds to the next step. Here, the ALJ concluded

at step four that Petitioner's medical improvement was related to his ability to work, and no exception applied. The ALJ therefore continued to step five.

At step five, the ALJ must determine whether all the claimant's current impairments in combination are severe. If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step. The ALJ determined that, as of September 1, 2014, Petitioner had the following impairments: systemic lupus erythematosus, chronic sinusitis, osteoporosis, obesity, cardiomyopathy, and bilateral osteonecrosis of the ankles with surgical repair of the right ankle. The ALJ found Petitioner's current impairments were severe because, singly or in combination, they "significantly limit (have more than a minimal effect on) his ability to perform basic work activities." (AR 25.)

At step six, the ALJ must assess the claimant's residual functional capacity based on the current impairments and determine if he can perform past relevant work. If the claimant can perform past relevant work, he is no longer disabled. If not, the analysis proceeds to the seventh and last step. The ALJ determined that, beginning on September 1, 2014, and based upon current impairments, Petitioner had the RFC to perform light work, except that Petitioner was limited to: lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and walking two hours total in an eight-hour work day and sitting for six hours in an eight hour work day; occasional operation of foot controls with his right lower extremity; and frequent balancing, stooping, kneeling,

crouching, and crawling. Petitioner must never climb ladders, ropes or scaffolds; must avoid concentrated exposure to extreme hot and cold temperatures, wetness, humidity, vibrations, and pulmonary irritants; and he must never work outdoors. (AR 25.) The ALJ also determined that Petitioner had no past relevant work.

At step seven, the ALJ must determine whether other work exists that the claimant can perform, given his residual functional capacity and considering his age, education, and past work experience. If the claimant can perform other work, he is no longer disabled. If the claimant cannot perform other work, his disability continues. To support a finding that an individual is not disabled at the final step, the Social Security Administration is responsible for providing evidence that demonstrates other work exists in significant numbers in the national economy that the claimant can do, given his residual functional capacity, age, education, and work experience. *See Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Bellamy v. Sec. of Health & Human Serv.*, 755 F.2d 1380, 1381 (9th Cir. 1985) ("Once a claimant has been found to be disabled, however, a presumption of continuing disability arises in [his] favor. The Secretary then bears the burden of producing evidence sufficient to rebut the presumption of continuing disability. This evidence must be produced before the Secretary can even consider the medical-vocational guidelines...and is reviewed under the 'substantial evidence' standard.").

The vocational expert testified that an individual of Petitioner's age, educational background, and RFC could be a ticket taker, silverware wrapper, and collator operator. Relying upon the vocational expert's testimony, the ALJ determined that, beginning on

September 1, 2014, Petitioner was able to perform a significant number of jobs in the national economy. (AR 28-29.) The ALJ concluded that Petitioner's disability ended on September 1, 2014, and he had not become disabled again since that date. (AR 29.) The ALJ rejected Petitioner's testimony about his chronic absenteeism, and consequently rejected the vocational expert's testimony that an individual with Petitioner's characteristics who missed two or more days of work per month, either because he was unable to come to work or because he was unable to be productive at work, would be unemployable. (AR 72.).

As stated above, Petitioner submitted additional medical records for consideration by the Appeals Council. (Exhibits 36F – 40F, AR 1608 – 1674.) The Appeals Council found that the evidence did not provide a basis for changing the ALJ's decision.

## STANDARD OF REVIEW

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). This standard of review applies to the agency's determination on whether a claimant continues to be disabled. *Hiller v. Astrue*, 687 F.3d 1208 (9th Cir. 2012). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a

preponderance, *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court must "independently determine whether the Commissioner's decision (1) is free of legal error and (2) is supported by substantial evidence." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the Petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

Here, because the Appeals Council considered new evidence in deciding whether to review the ALJ's decision, the evidence becomes part of the administrative record which the Court must consider when reviewing the Commissioner's final decision for substantial evidence. *Brewes*, 682 F.3d at 1163 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999) (holding that a court reviewing the Commissioner's decision must consider the record as a whole). The Court must therefore consider evidence

submitted for the first time to the Appeals Council to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence. *Brewes*, 682 F.3d at 1162; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1030 n.2 (9th Cir. 2007) (noting that when the Appeals Council considers new evidence in denying a claimant's request for review, the reviewing court considers both the ALJ's decision and the additional evidence submitted to the Appeals Council.).

## DISCUSSION

Petitioner argues error occurred at step seven of the sequential evaluation. Petitioner first asserts the ALJ erroneously assessed Petitioner's credibility with regard to his testimony concerning absenteeism based upon the medical records before the ALJ. In addition, Petitioner contends that substantial evidence showed Petitioner's medical condition was not well controlled after the hearing date of May 23, 2016, citing to the medical evidence submitted to and considered by the Appeals Council. (AR 16 at 8.) Accordingly, Petitioner argues the ALJ's credibility determination, which rejected Petitioner's testimony about his absenteeism, was erroneous and resulted in an RFC that failed to account for all of Petitioner's medically determinable impairments and their effect as a whole on his capacity to perform work on a consistent and regular basis. Petitioner asks the Court to remand the matter for further proceedings.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). When reviewing a case under the substantial evidence standard, the Court may question an

ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). The claimant is not required to show that his impairment could reasonably be expected to cause the severity of the symptoms he has alleged; he need only show that it could reasonably have caused some degree of the symptoms. *Id.* Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof. *Id.*

If the claimant satisfies the first step of this analysis, and there is no evidence of

malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so. *Burch*, 400 F.3d at 680. This is not an easy requirement to meet---the clear and convincing standard is the most demanding required in Social Security cases. *Garrison*, 759 F.3d at 1014–15 (citations omitted) (internal quotation marks omitted).

The ALJ may consider several factors when weighing the claimant's credibility, including the claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and his conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which the claimant complains. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Also, the ALJ may consider the location, duration and frequency of symptoms; factors that precipitate and aggravate those symptoms; the amount and side effects of medications; and treatment measures taken by the claimant to alleviate those symptoms. *See* Soc. Sec. Ruling 96-7p.

Petitioner testified during the hearing before the ALJ in May of 2016 about his attendance issues during his mission and about his functional limitations. Although he expressed that he would be able to perform a sedentary job "a lot of the time," he testified that his multiple medical conditions provoked recurrent symptoms such as fatigue and infections, resulting in sequential days when he was not able to function. (AR 53.) The ALJ, who had the benefit of Petitioner's medical records submitted up through the date of

the hearing on May 23, 2016,[7] relied extensively upon the fact that Petitioner was able to participate in missionary work in Missouri. (AR 27.)[8] The ALJ concluded that Petitioner's schedule of activities during that time was rigorous, and exceeded Petitioner's RFC, such that a return to a normal work schedule should not produce illness or fatigue. (AR 27.) The ALJ noted also that Petitioner's lupus symptoms were well controlled with medication and that Petitioner was able to exercise in a gym on occasion. (AR 57, 27.) Consequently, the ALJ determined the medical evidence did not support Petitioner's claim of disabling symptoms, and he disregarded Petitioner's assertions of chronic absenteeism.

The vocational expert testified that an individual with Petitioner's RFC employed as a ticket taker, silverware wrapper, or collator operator who had three days or more of unscheduled absences per month on a recurring basis would be unemployable. (AR 70-72.) But the ALJ rejected Petitioner's assertions of chronic absenteeism, and determined that, if Petitioner simply worked a regular schedule at a light or sedentary exertional level that did not expose him to the public, he would have the ability to sustain full-time employment within the confines of Petitioner's RFC.

The Appeals Council considered additional medical records, discussed above, which covered the period after the May 23, 2016 hearing date, as well as Petitioner's

_____

[7] Exhibit 35F, comprising medical records from Dr. Hersh and covering the period from March 18, 2015, to April 4, 2016, was submitted to the ALJ on May 20, 2016. (AR 42 - 43, 1592 – 1606.)

[8] The Court notes, however, that Petitioner lasted only seven months with the rigorous missionary schedule, while having health problems during that time.

briefing regarding chronic absenteeism. The Appeals Council found the additional evidence did not provide a basis for changing the ALJ's decision. (AR 4.)

The Court finds, however, that when considering the record as a whole, including the medical evidence submitted to the Appeals Council, the ALJ erred in denying benefits. *Brewes*, 682 F.3d at 1163. The ALJ found Petitioner's testimony about his chronic absenteeism not credible, finding that the medical records before him did not support Petitioner's testimony about his chronic conditions causing fatigue and recurring infections that, in turn, would cause excessive absenteeism. However, the additional evidence Petitioner submitted to the Appeals Council was directly responsive to the reason the ALJ discredited Petitioner's testimony. Petitioner's medical records documenting treatment during the second one-half of 2016 and the first one-half of 2017 reflect that, even upon returning home to Idaho from his mission and no longer having a rigorous schedule, Petitioner suffered recurrent infections. He complained also of chronic fatigue and depression symptoms to his treating physicians. Although Petitioner's treating physicians initially believed sinus surgery, which had not yet been performed at the time of the May 23, 2016 hearing before the ALJ, would eliminate Petitioner's recurring infections and fatigue, it did not.

Rather, the record reflects worsening fatigue, and two serious infections after the sinus surgery was performed in or about June of 2016. Petitioner's C. difficile infection required isolation precautions. (AR 1612.) Petitioner's bout with cellulitis necessitated hospitalization, during which Petitioner developed a cough, later diagnosed as

bronchopneumonia in the right lung. (AR 1651.) And, his longtime treating rheumatologist, Dr. Hersh, submitted a medical opinion letter dated January 4, 2017, in which she explained that Petitioner's fatigue and frequent doctor visits "interfer[e] with his ability to attend work, go to school or to participate in an LDS church mission…." (AR 1632.)

The medical records covering the period after the May 2016 hearing were not examined by the ALJ, and cast serious doubt upon the ALJ's determination that a return to a less rigorous schedule would alleviate Petitioner's potential absenteeism. Based upon the above, the Court finds the Commissioner's decision denying Petitioner disability benefits is not supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court will reverse the Commissioner's decision and remand for further proceedings.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3)      This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: March 28, 2019

Honorable Candy W. Dale
United States Magistrate Judge